RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SCOTT A. SAVAGE,

                 *Plaintiff-Appellant,*

      *v.*

E. GORDON GEE, individually and in his
capacity as President of The Ohio State
University, et al.,

                 *Defendants-Appellees.*

No. 10-3839

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 08-00235—William O. Bertelsman, District Judge.

Argued: November 17, 2011

Decided and Filed: January 4, 2012

Before: MARTIN, GUY, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Thomas W. Condit, Cincinnati, Ohio, for Appellant. Drew C. Piersall, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Thomas W. Condit, Cincinnati, Ohio, for Appellant. Drew C. Piersall, Jack W. Decker, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. Scott Savage appeals the district court's grant of summary judgment in favor of Defendants E. Gordon Gee, President of The Ohio State University, in his individual and official capacity; Karen A. Holbrook, former President of the University, in her individual capacity; Nancy K. Campbell,

Assistant Vice President of the Office of Human Resources at the University, in her individual and official capacity; T. Glenn Hill, a human resources consultant at the University, in his individual and official capacity; the members of the board of trustees of the University, all in their individual and official capacities; and five University Professors. Savage sought damages and injunctive relief, alleging that he was constructively discharged in retaliation for the exercise of his First Amendment rights; that the University's sexual harassment policy is unconstitutionally vague and overbroad; and several other constitutional claims. The district court found that Savage had waived his damages claims by previously raising related claims before the Ohio Court of Claims, and that his claims for injunctive and declaratory relief were without merit. Savage appeals this decision, arguing that monetary relief is not barred here, and that the district court erred in dismissing his injunctive and declaratory claims. For the following reasons, we **AFFIRM** the decision of the district court.

## I.

Savage was Head of Reference and Library Instruction at The Ohio State University's Bromfield Library in Mansfield, Ohio, from August 2004, until his resignation on June 27, 2007. Savage assisted faculty and students with research, helped prepare course bibliographies, and taught students research methods. Savage's direct supervisor, Elizabeth Burns, was the director of the library. In February 2006, Savage joined a committee formed to choose a book that would be assigned to all incoming freshmen. Other members of the committee included faculty members Hannibal Hamlin, Norman Jones, and Committee Chair Donna Hight, the Student Affairs Director. After several committee members recommended books that the parties characterize as "liberal," Savage wrote to Hight to propose the book *Freakonomics* by Steven Levitt and Stephen Dubner. Hight forwarded Savage's proposal to the entire committee on March 2, noting that she had received a request that the committee not "choose an ideologically or politically or religiously polarizing book." On March 3, Hamlin responded by e-mail to the entire committee stating that a book that "seriously engage[s]

the students in an issue or issues of real importance . . . is bound to be at least somewhat divisive."

On March 8, Savage replied to Hamlin in an e-mail to the committee: "[I]f we are decided that we want to engage our students in the kind of exchange of ideas on which the 'secular' university is founded, then let's choose something that confronts the accepted wisdom of Ohio State University!  Like students and young profs did in the 60's, man!"  His e-mail listed four book titles, providing a short description of each book.  One of the books, *The Marketing of Evil* by David Kupelian, contains a chapter describing homosexuality as aberrant human behavior.  Savage's description of the book did not mention this chapter.

On March 9, Jones, who is gay, responded, describing Savage's suggestion as "anti-gay" and "homophobic tripe."  Savage responded to Jones on the same day, defending his suggestion of *The Marketing of Evil.*  Savage, Hamlin, and Jones continued to exchange e-mails on the issue.  Hamlin and Jones criticized the book as bigoted and homophobic and, eventually, questioned Savage's competence and professionalism as a librarian.  Jones sent an e-mail to Burns, stating that Savage's recommendation "severely damage[d]" Jones's "confidence in the library and its staff" and would affect his use of library staff.

On March 9, Burns sent an e-mail to the Dean of the University's Mansfield campus, Evelyn Freeman, and Jones, describing Jones's e-mail as a "personal assault" on Savage.  That same day, Savage withdrew from the book selection committee.  Another professor, Jim Buckley, sent an e-mail to all University faculty and staff stating that Savage had made him "fearful and uneasy being a gay man on this campus."  On March 12, Jones sent an e-mail to the entire Mansfield campus summarizing the argument and stating that Savage's continued endorsement of the book amounted to calling Jones "and Jim and other gay and lesbian people 'evil.'"

During a regularly-scheduled faculty assembly meeting on March 13, the faculty voted on a motion to "bring this episode to the attention of the sexual harassment officer" of the University.  At a meeting, two days later the faculty rescinded the motion

but participants noted that individuals could file their own complaints related to the issue with Human Resources.

On March 16, Professor Gary Kennedy, on behalf of Buckley and Jones, filed a "Discrimination/Harassment Complaint Form" against Savage, claiming "harassment based on sexual orientation." On March 20, Hamlin filed what he described as a "report" with Human Resources, complaining about Savage's "inappropriate behavior." Glenn Hill, an employee relations consultant at the University, handled the complaints of Kennedy and Hamlin. Hill interviewed five or six faculty members to investigate the complaints against Savage.

On April 11, Savage filed a complaint of harassment against Phelps, Jones, Buckley, Hamlin, and Kennedy for filing false complaints of sexual harassment against him. Hill was also assigned to investigate Savage's complaint.

On April 20, Savage received a letter from Hill stating that the University had determined that there was no basis for the harassment charges filed against him. On April 26, Savage received another letter from Hill stating that there was no basis for the complaint filed by Savage. Despite the resolution of the complaints, Hamlin told Dean Freeman that he thought Savage should be fired. Dean Freeman replied that Savage would not be fired. Faculty and staff continued to exchange e-mails and letters about Savage's behavior through April and May. Hamlin and Phelps told other faculty members that the harassment issue had not been resolved and questioned how the faculty could continue to work with Savage.

On July 5, 2006, Savage took a leave of absence from his job because of his "extreme emotional distress" related to the accusations against him and his belief that the University had not "taken any meaningful action to vindicate" him. He later renewed this leave. Savage testified that, at the time he took and renewed the leave, he intended to return to his job.

In addition to this case, Savage filed two other lawsuits relating to the facts herein. In March 2007, Savage filed suit against several University officials in the

Richland County Ohio Court of Common Pleas.  On April 7, Savage filed suit in the Court of Claims of Ohio asserting federal and state law claims against University officials and the University itself.  The University moved to dismiss these claims. According to Savage, the "nasty and derisive tone" of the University's attorneys in its motion to dismiss convinced him that he would have "no institutional backing at the highest administrative level were he to return" to the University.  On June 27, 2007, Savage resigned. On July 29, 2008, after some discovery and motions, Savage dismissed his Court of Claims action.

On March 10, 2008, before dismissing his Court of Claims action, Savage filed this action in federal court.  In his Complaint, Savage alleged several claims for damages: constructive discharge in retaliation for engaging in protected speech pursuant to 42 U.S.C. § 1983; an equal protection violation pursuant to § 1983 and § 1985; and an action for neglecting to prevent a § 1985 violation pursuant to § 1986.  Savage also sought injunctive relief, claiming that the University's sexual harassment policy is unconstitutionally vague and overbroad, both facially and as applied to Savage, and seeking reinstatement.

The Defendants filed a motion for summary judgment on January 7, 2009, invoking *Leaman v. Ohio Department of Mental Retardation & Development Disabilities*, 825 F.2d 946 (6th Cir. 1987) (en banc).  The Defendants argued that Savage had waived all federal and state damages claims against state officials arising from the above-recited facts by bringing an action in the Court of Claims.  On February 10, Savage moved the district court to certify a question about the validity of *Leaman* to the Supreme Court of Ohio.  The district court denied both the motion to certify and the motion for summary judgment, the latter without prejudice.  Subsequently, the Defendants renewed their motion for summary judgment. The district court found that Savage's claims for damages were barred by *Leaman*; his right to free speech was not infringed because his speech was not protected; he was not constructively discharged; he lacked standing to bring a facial challenge to the University's sexual harassment policy; and that his as-applied challenge to the policy failed because he sustained no

cognizable harm because of the policy. Savage appeals the district court's decision as to each of his claims.

## II.

This Court "review[s] a district court's grant of summary judgment *de novo*." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (citation omitted). Summary judgment is proper if the materials in the record "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party." *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### A.  Damages Claims

Savage argues that the district court erred in finding that he waived his claims for damages by bringing a related suit in the Court of Claims of Ohio. Savage also argues that the district court erred by failing to certify to the Ohio Supreme Court the question of whether his damages claims were barred and asks us to certify the question. In *Leaman*, 825 F.2d at 952, this Court interpreted Ohio Revised Code § 2743.02(A)(1), which states, in part:

> Except in the case of a civil action filed by the state, filing a civil action in the court of claims results in a complete waiver of any cause of action, based on the same act or omission, which the filing party has against any officer or employee.

We determined that, "[i]n providing that an election to sue the state in the Court of Claims results in a complete waiver of any cognate cause of action against individual state officers or employees, the Ohio legislature clearly provided for waiver of federal causes of action, as well as causes of action based upon state law." *Leaman*, 825 F.2d at 952.

Savage argues that a statement by the Ohio Supreme Court in *Conley v. Shearer*, 595 N.E.2d 862 (Ohio 1992), abrogated the holding in *Leaman* because *Conley* found

that § 2743.02 and § 9.86 do not apply to federal claims. Since *Conley*, however, this Court has repeatedly reaffirmed *Leaman* and expressly determined that *Conley* did not disturb its holding. *See Thomson v. Harmony*, 65 F.3d 1314 (6th Cir. 1995) (interpreting *Conley* to mean that a claim under § 1983 may be brought directly in the Court of Common Claims, and thus is not subject to Ohio Rev. Code § 2743.02(F)); *see also Plinton v. Cnty. of Summit*, 540 F.3d 459, 463 (6th Cir. 2008) ("The Sixth Circuit has consistently applied *Leaman* to bar plaintiffs from bringing suit in federal court against a state employee after bringing suit against the state in the Court of Claims based on the same claim.") (citation omitted). Though the holding in *Leaman* has been criticized, *see Leaman*, 825 F.3d at 960-71 (Merritt, Chief Judge, Martin, J., Jones, J., and Milburn, J., separately dissenting), it remains the law of our Circuit. Because we have repeatedly held that federal damages claims against state officials are barred where claims based on the same act or omission were previously raised in the Court of Claims, we agree with the district court's finding that Savage's claims for damages are barred. We decline to certify the issue to the Ohio Supreme Court.

## B. First Amendment Retaliation

Savage argues that the district court wrongfully granted summary judgment to the Defendants on his First Amendment retaliation claim. Specifically, he argues that his speech was "related to academic scholarship or classroom instruction" and should therefore be exempt from the traditional First Amendment analysis applied to public employees.

To prevail in a claim of retaliatory discharge in violation of the First Amendment, a plaintiff must show that: (1) his expressions were protected under the First Amendment; (2) he suffered an adverse employment action; and (3) "the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights." *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (citations and internal quotation marks omitted). For First Amendment protections to inhere in speech made by a government employee, the employee's speech must have been made "as a citizen," while addressing "a matter of public concern."

*Connick v. Myers*, 461 U.S. 138, 146-47 (1983); *Fox*, 605 F.3d at 349.  Next, the government employee must show that his interest in speaking outweighs the government's interest "as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Educ.*,  391 U.S. 563, 568 (1968).  A government employee's speech is not protected, however, where it is made "pursuant to his duties."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (finding that a prosecutor's speech in a memo and during a hearing was not protected by the First Amendment because it was made pursuant to his official duties).

The district court found that Savage's speech addressed "a matter of public concern" but that it was nonetheless unprotected by the First Amendment because it was made pursuant to his official duties.  We agree that Savage's speech was not protected by the First Amendment because the speech was made pursuant to his duties as Head of Reference and Library Instruction.  *See Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 339-40 (6th Cir. 2010) (finding that "curricular and pedagogical choices" made "in connection with [plaintiff's] official duties as a teacher" are not protected by the First Amendment) (citations omitted); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543-44 (6th Cir. 2007) (applying *Garcetti* to ad hoc duties even though they may not be within employee's official responsibilities).  Savage does not quarrel with the finding that his speech was made pursuant to his official duties and instead argues that his speech was nonetheless protected by the First Amendment under an exception he claims was established in *Garcetti*.  In *Garcetti*, the Supreme Court noted that "[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence."  547 U.S. at 425.  Based on this dicta, Savage argues that his speech is excepted from the usual analysis applied to the speech of public employees and is instead protected by the First Amendment.

This Court recently applied *Garcetti* to a teacher's claim of First Amendment retaliation.  In *Evans-Marshall*, we found that the curricular choices of a teacher, including the assignment of several books to students, was not protected speech because

it was made in connection with her official duties as a teacher. *Evans-Marshall*, 624 F.3d at 339-40; *see also Fox*, 605 F.3d at 348-50 (applying *Garcetti* to a teacher's complaint to her supervisor about the number of students assigned to her supervision, and finding that her statements were not entitled to First Amendment protection). As in *Evans-Marshall*, Savage's speech as a committee member commenting on a book recommendation was not related to classroom instruction and was only loosely, if at all, related to academic scholarship. Thus, even assuming *Garcetti* may apply differently, or not at all, in some academic settings, we find that Savage's speech does not fall within the realm of speech that might fall outside of *Garcetti*'s reach.

Further, as discussed in greater detail below, Savage cannot prevail on his First Amendment retaliation claim because he has failed to present evidence of any adverse employment action. *Fox*, 605 F.3d at 348 (explaining that an adverse employment action is a required part of a plaintiff's retaliatory discharge claim).

## C. Constructive Discharge

Savage asserts that the district court wrongfully granted summary judgment to the Defendants on his constructive discharge claim. To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) "the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person," (2) the employer did so "with the intention of forcing the employee to quit," and (3) "the employee . . . actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

In seeking to prove that his working conditions were intolerable, Savage describes the "mocking attitude" of the University's motion to dismiss his Court of Claims suit as the "last straw," but claims that his work environment had "already been poisoned" by faculty who stated that they would no longer send students to his office. Savage relies on testimony by Burns that, after May 2006, Savage was "noticeably depressed." Savage also argues that there was a "campaign" by faculty to boycott the

campus library. Savage presented evidence that faculty members were critical of his book suggestion, professed discomfort about Savage assisting them with research, and publicly challenged his professionalism. Such criticisms and public challenges alone, however, do not establish constructive discharge. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 479 (6th Cir. 2002) ("[H]urt feelings are not enough to create a case of constructive discharge."). Further, Savage has not presented any evidence that the University intended to force him to quit. Savage acknowledges that he was supported by Burns, his direct supervisor, and there is evidence that he also had Dean Freeman's support. In a March 13, 2006, letter to the Alliance Defense Fund, Savage described Dean Freeman as "very deftly trying to stop any further attacks on me." After Savage sought an extension to his leave of absence, Dean Freeman stated that "it is definitely in the best interest of [the University]" to grant Savage the extension. Freeman testified that both the University Provost and representatives from the Office of Human Resources visited the Mansfield campus and conducted meetings to mediate the rift. The record reveals that Savage had the support of his superiors and, though many members of the faculty were critical of Savage, he has failed to show either that conditions were objectively intolerable or that the University intended for him to quit. Viewing the facts in the light most favorable to Savage, the District Court did not err by finding that there was no triable issue on Savage's constructive discharge claim.

## D. Facial Challenges to the University's Policy

Savage claims that the University's sexual harassment policy is unconstitutionally vague and overbroad. The district court determined that Savage lacked standing to bring a facial challenge to the University's policy and, on appeal, Savage argues that this was error. We review a district court's decision that a litigant lacks standing de novo. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir. 2007) (citation omitted). To have standing to raise a First Amendment claim, a plaintiff must (1) satisfy the case-and-controversy requirement, and (2) demonstrate that he is a proper party. *See, e.g.*, *Sec'y of State of Md. v. Joseph H. Munson, Co.*, 467 U.S. 947, 955-57 (1984). Standing requires plaintiffs to demonstrate "actual present harm or

a significant possibility of future harm." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citation omitted). "There are two potential theories of injury—'actual' present injury and 'imminent' future injury." *Thomas More Law Cntr. v. Obama*, 651 F.3d 529, 535 (6th Cir. 2011) (citation omitted). While the doctrines of overbreadth and vagueness provide an exception to the traditional rules of standing and allow parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a policy is so broad or unclear that it will have a chilling effect, *Coates v. City of Cincinnati*, 402 U.S. 611, 619-20 (1971); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995),"[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). "In order to have standing . . . a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent." *Morrison v. Bd. Of Educ. of Boyd Cnty.*, 521 F.3d 602, 610 (6th Cir. 2008) (citation omitted); *accord Prime Media, Inc.,* 485 F.3d at 350 ("Because overbreadth creates an exception only to the prudential standing inquiry, the Supreme Court has made clear that the injury in fact requirement still applies to overbreadth claims under the First Amendment.") (citation omitted).

Savage, who is no longer employed by the University and is not entitled to reinstatement, cannot demonstrate harm by claiming imminent enforcement of the policy. *Cf. Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 673 (7th Cir. 2006) (holding that instructor lacked standing to seek injunction against college's restriction on her speech because she was no longer employed and could not show "real and immediate" danger of injury from allegedly wrongful restriction); *see also Thomas More*, 651 F.3d at 536 (describing imminence as "a function of probability"). Savage, having failed to demonstrate he was constructively discharged, has also failed to show that he was harmed by the University's enforcement of the policy. The University's investigation of Savage does not rise to the level of "concrete harms" we have previously identified as injuries sufficient to confer standing. *See, e.g.*, *Morrison*, 521 F.3d at 609 (providing a "non-exhaustive list" of what "might be required to substantiate an otherwise-

subjective allegation of chill," including a temporary retraining order; an eight-month investigation into the activities and beliefs of the plaintiff's alleged seizure of membership lists; and alleged seizures of properties belonging to the plaintiff) (citation omitted). Professor Kennedy filed the first complaint against Savage on March 16, 2006. The investigation, which consisted of interviews with only five or six other professors, was concluded by April 20. The relatively short and limited investigation that occurred here does not constitute a specific harm resulting from the University's enforcement of its sexual harassment policy. The district court correctly determined that Savage lacks standing to bring a facial challenge to the University's policy because he did not demonstrate actual or imminent harm.

**E.  As-Applied Challenge to the University's Policy**

Savage argues that the policy is unconstitutionally overbroad as it was applied to him because, pursuant to the policy, the University conducted an investigation based on subjective complaints. As is the case regarding his facial challenges, however, Savage lacks standing to bring this claim because he has not alleged a concrete harm. *See, e.g.*, *Morrison*, 521 F.3d at 609-10 (collecting cases). The district court correctly dismissed Savage's as-applied challenge on this basis.

**III.**

Finding no merit to Savage's claims, we **AFFIRM** the district court's judgment and order granting the Defendants' motion for summary judgment.